**Reversed and Remanded and Opinion filed May 29, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-11-00342-CR

### JAIME ARTURO ZAMORA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1225557**

## OPINION ON REMAND

Appellant Jaime Arturo Zamora's appeal of his conviction for capital murder is before us on remand. When this case was first before us, appellant argued that the trial court erred in failing to instruct the jury that if it determined that witness Benjamin Rosales was a co-conspirator accomplice, then it could consider Rosales's testimony only if it was corroborated by other evidence tending to connect appellant to the offense. *Zamora v. State*, 375 S.W.3d 382, 388–89 (Tex.

App.—Houston [14th Dist.] 2012, pet. granted). We concluded that this complaint was waived because appellant had asked the trial court to instruct the jury to determine whether Rosales was a direct-party accomplice rather than a co-conspirator. *Id.* at 389. The Court of Criminal Appeals reversed and remanded the cause for us to consider appellant's charge-error complaint under the procedural framework of *Almanza*. *See Zamora v. State*, 411 S.W.3d 504, 506 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)).

We conclude that the evidence raises a question of fact as to whether Rosales was a co-conspirator accomplice, and thus, the trial court erred in failing to instruct the jury accordingly. We further conclude that appellant was egregiously harmed by the error. We accordingly reverse the trial court's judgment of guilt and remand for a new trial.

## I. BACKGROUND

On May 20, 2006, Jose Perez had dinner with his wife and their two children at Chilo's Seafood Restaurant in Houston. After dinner, Perez secured the couple's infant son in the back seat of the car, then opened the driver's side door. Before Perez could enter the car, a man approached him from behind. Without saying anything, the man shot Perez repeatedly, then ran and jumped into a vehicle waiting at an adjacent service station. Perez died from his wounds. There was no apparent motive for the shooting.

Two-and-a-half years later, appellant was arrested for Perez's murder. The State's theory was that before Perez's murder, appellant offered to pay the monetary equivalent of a kilo of cocaine for the murder of a different man—

2

Santiago Salinas—and that Perez was shot because he was mistaken for Santiago.[1] According to the State, appellant gave the contract for Santiago's murder to Jose Armando "Mando" Chapa. Chapa was said to have used another man, Steven Torres, as a subcontractor for the job, and Torres hired two other men—Michael Belmarez and Pedro Quintanilla—to kidnap or kill Santiago. Quintanilla was said to be the person who actually shot Perez.

Among the witnesses who testified at appellant's trial were four men whom appellant characterizes as accomplices. Belmarez admitted he was the driver of the vehicle in which the man who shot Perez fled the scene; the trial court instructed the jury that Belmarez was an accomplice as a matter of law. Chapa also testified at trial, and Rogelio "Roy" Gonzalez, appellant's brother-in-law, testified to his own participation in discussions about having Santiago killed. The trial court instructed the jury that there was a question of fact about the accomplice status of Chapa and Gonzalez under a direct-party theory of liability. A fourth witness, Benjamin "B2" Rosales, testified that in the months before the Perez murder, he knew that appellant had people ready to act if Santiago could be found, and he helped look for Santiago and called appellant on the two occasions when he sighted Santiago, although neither of these occasions was on the date that Perez was shot. When Rosales and appellant saw Santiago some months after Perez was killed, Rosales arranged to have his friends detain Santiago while Rosales called another gunman, who successfully completed Santiago's murder. The trial court refused appellant's request to give the jury the same accomplice-witness instruction about Rosales that was given about Chapa and Gonzalez.

---

[1] Because more than one person with the last name of Salinas or Zamora are discussed in this opinion, we identify each such person other than appellant by his or her first name.

Appellant was convicted and sentenced to imprisonment for life without parole. We overruled each of the issues presented for our review and affirmed the conviction. The Court of Criminal Appeals reversed, and we now consider appellant's charge-error complaint under *Almanza's* procedural framework.

## II. ERROR ANALYSIS

When an appellant argues that the trial court erred in failing to give an accomplice-witness instruction, our first task is to determine whether the trial court erred in failing to give such an instruction *sua sponte*. *Zamora*, 411 S.W.3d at 506. As a matter of Texas law, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (accomplice-witness testimony "must be corroborated by independent evidence tending to connect the accused with the crime"). Faced with conflicting or inconclusive evidence as to whether a witness is an accomplice, the trial judge must instruct the jury first to decide the question, and then, if the jury determines that the witness is an accomplice, to apply the corroboration requirement. *Zamora*, 411 S.W.3d at 510.

An accomplice is someone who may be charged with the same or a lesser-included offense, whether as a principal, a direct party, or a co-conspirator. *Id.* at 511. A person is guilty as a co-conspirator for the conduct of another if, in the attempt to carry out a conspiracy to commit one felony, and in furtherance of the unlawful purpose, one of the conspirators commits another felony "that should have been anticipated as a result of the carrying out of the conspiracy." TEX. PENAL CODE ANN. § 7.02(b) (West 2011). We conclude that the evidence was

4

sufficient to raise a fact question as to whether Rosales was an accomplice under a co-conspirator theory, and thus, the trial court erred in failing to instruct the jury accordingly.

Appellant urges that Rosales was a co-conspirator in the attempt to carry out the murder of Santiago. In arguing to the contrary, the State asserts that there were two conspiracies, one in which Rosales hired the gunmen who succeeded in murdering Santiago at a hotel in November 2006, and an earlier "botched" conspiracy in which Perez was killed. The State refers to Perez's murder as "a crime committed with an entirely different group of conspirators and without any knowledge or participation by Rosales." Thus, the State posits, Rosales's involvement did not pertain to the conspiracy to murder Santiago himself. We therefore examine the record to determine whether there is evidence that Rosales was a co-conspirator in a conspiracy to murder Santiago that arose prior to Perez's death.

We begin with evidence that the conspiracy arose prior to Perez's death in May 2006. Rosales testified that appellant believed that Santiago Salinas owed him money for some "lost" kilos of cocaine. According to Rosales, appellant had three choices: he could try to collect the money, kidnap Santiago to coerce him into paying, or simply kill him. Rosales testified that Santiago went to Monterrey, Mexico, where he paid appellant's brother Danny only part of the money that was owed while continuing to spend a lot of money entertaining. Rosales said that the people in the Monterrey end of the Zamora family's drug business felt disrespected, "and then that's when they decided they were going to go ahead and kidnap [Santiago] there in Monterrey." During this trip, Santiago was shot in the neck. *Id.* Santiago's mother testified that her son was shot on September 30, 2005; that he was in the hospital for ten days; and that he then flew back to

Houston.

Rosales stated that when Santiago returned to Houston, appellant reported that "Santiago was saying that the people over there [in Mexico] couldn't do anything right, that they couldn't even—they couldn't even shoot him right. They couldn't kill him." Rosales further testified that when appellant heard about this boast, things changed, and "[t]hey were wanting to go ahead and just kill [Santiago]." According to Rosales, appellant told him before the shooting at Chilo's that there was a contract to kill Santiago and that appellant "had some people already ready to go and get him."

Appellant asked Rosales for his help in finding Santiago. Rosales said that he knew Santiago's vehicles, and knew the places where he could normally be found. These included Slick Willie's Pool Hall (where Santiago bragged that "they couldn't even kill him right"), Chilo's (where Santiago was present on the night Perez was shot) and the Ritz Cabaret (where appellant and Rosales later found Santiago on the night they succeeded in having him killed). Rosales said that when he left work, he "would drive by most of the places and then go home." Twice before the Chilo's shooting, Rosales saw Santiago and called appellant, but Santiago was not found.

The State points to other evidence supplied by Rosales that the conspiracy arose after Perez's death. Rosales testified that appellant first decided to kill Santiago after appellant's brother Danny was killed, but there is no non-accomplice testimony about the date of Danny's death. Rogelio testified that Danny was killed on November 2, 2006, but the jury was instructed to determine as a question of fact whether Rogelio was an accomplice, and as discussed further *infra*, the record indicates that the jury did determine that Rogelio was an accomplice. Moreover, even if the jury could infer from non-accomplice-witness

6

testimony that Danny was killed after Perez, Rosales's testimony that Danny's murder triggered appellant's decision to have Santiago killed is inconsistent both with Rosales's earlier testimony that the decision was made in response to Santiago's boasts about surviving the first murder attempt, and with the non-accomplice evidence that the first attempt to murder Santiago predated Perez's shooting by nearly eight months.

Nevertheless, the jury was entitled to resolve any conflict in the evidence about the time when appellant decided to have Santiago killed. At a minimum, there is sufficient evidence from which the jury could have concluded that Rosales was a part of the Santiago murder conspiracy at the time of Perez's death on May 20, 2006. No witness identified anyone other than appellant as the person who offered remuneration for the murder of another person, and no witness identified anyone other than Santiago as the target of that conspiracy. Even if Rosales played different roles at different times—at first only attempting to find Santiago so that gunmen hired by someone else could be called in to kill him, and later hiring and calling the gunman himself—there is evidence that both before and after Perez's death, Rosales conspired with appellant in Santiago's murder. The trial court therefore erred in failing to include in the charge an accomplice-in-fact instruction regarding Rosales under a co-conspirator theory of liability.

### III. HARM ANALYSIS

If charge error has been properly preserved by an objection or request for instruction, we must reverse if the error is calculated to injure the defendant's rights, that is, if there was "some harm." *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003). If the error has not been preserved, we will reverse only for "egregious harm." *Almanza*, 686 S.W.2d at 171. Egregiously harmful errors "are those that affect the very basis of the case, deprive the defendant of a valuable

7

right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172). Whether analyzing the record for "some" harm or for egregious harm, the reviewing court should consider the entire jury charge, the state of the evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). The harm must be actual, not merely theoretical. *Almanza*, 686 S.W.2d at 174.

In our original opinion in this case, we held that appellant failed to preserve error because, in effect, his appellate complaint—that is, that the trial court erred in failing to instruct the jury that Rosales was an accomplice as a matter of fact under a co-conspirator theory—did not comport with his complaint in the trial court, where he sought an accomplice-witness instruction only under a direct-party theory. *See Zamora*, 375 S.W.3d at 389. It is unnecessary for us to revisit our earlier error-preservation determination, because we conclude that the charge error resulted not merely in "some harm," but in egregious harm.

To be considered egregiously harmful, an error must "affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172). Here, the charge error was egregiously harmful because the only evidence that tends to connect appellant to Perez's murder is the testimony of witnesses about whom there was at least a question of fact as to their accomplice status. The failure to instruct the jury of the need to determine Rosales's accomplice status made the case for conviction clearly and significantly more persuasive because it allowed the jury to treat Rosales's testimony as corroboration

8

for the testimony of other accomplices without first determining whether Rosales was an accomplice and if so, whether his own testimony was corroborated by non-accomplice evidence tending to connect appellant to Perez's death. This was actual and not merely theoretical harm because the jury would have answered those questions by determining that each such witness did in fact act as an accomplice, and if the jury had been properly instructed to determine whether Rosales was a co-conspirator accomplice, then the jury would have found that he was in fact an accomplice as well. As a result, the accomplice-witness testimony forms a loop in which each accomplice's testimony was corroborated, if at all, only by other accomplice-witness testimony.

## A.    The Jury Charge

In analyzing how jurors resolved the factual questions about whether Chapa and Gonzalez were accomplices, and how they would have viewed Rosales's accomplice status if they had been properly instructed, our task is made simpler by the ease with which we can identify the only theory under which jurors could have convicted appellant.

The trial court instructed the jury that it could convict appellant of capital murder under any of four theories, and as the Court of Criminal Appeals pointed out, three of them are contrary to the undisputed evidence at trial. Under the first theory, appellant could be convicted if he paid or promised to pay someone to kill Perez. *Zamora*, 411 S.W.3d at 507. Under the second theory, appellant could be convicted as a direct party if he "solicited, encouraged, directed, aided, or attempted to aid Quintanilla and/or Torres and/or Belmarez in the shooting of Perez for remuneration or promise of remuneration." *Id.* Under the third theory, appellant could be convicted if he was part of a conspiracy to kidnap Perez, in the course of which Quintanilla killed Perez. *Id.* at 508. In each of these theories, the

9

jury instructions identified Perez as the intended victim, but as the Court of Criminal Appeals pointed out, "It was undisputed at trial that Perez was mistakenly killed in place of [Santiago] Salinas, the actual intended victim." *Id.* at 508 n.1.

In the fourth theory, the jury was instructed as follows:

> Now, if you believe from the evidence beyond a reasonable doubt that Jaime Zamora, in Harris County, Texas, on or about May 20, 2006, unlawfully intended to cause the death of Santiago Salinas by employing another for remuneration or the promise of remuneration, to wit, money, by shooting Santiago Salinas with a deadly weapon, namely, a firearm, but instead of causing the death of Santiago Salinas caused the death of Jose Perez by shooting Jose Perez with a deadly weapon, namely, a firearm, then you will find the defendant guilty of capital murder, as charged in the indictment.

Because this is the only theory that identifies Santiago instead of Perez as the intended victim, the jury must have relied on this theory in convicting appellant.

Just as the charge authorized the jury to convict appellant of Perez's murder even though he meant to kill Santiago, the jury was authorized to apply the same theory of transferred intent to the accomplices. This is seen by the fact that this application paragraph of the charge is immediately followed by the accomplice-witness instructions, none of which specifically identify either Perez or Santiago as the intended victim. In considering the state of the evidence, then, our inquiry focuses on whether the State's case under a transferred-intent theory was made clearly and significantly more persuasive by the trial court's failure to charge the jury that there was a question of fact as to Rosales's status as a co-conspirator accomplice. We conclude that the error did have such an effect.

## B.    The State of the Evidence

The only evidence that tends to connect appellant to Perez's death is the testimony of witnesses about whom there was at least a question of fact as to their

10

accomplice status.  To illustrate, we will summarize first the testimony of witnesses who were not asserted to be accomplices.  These non-accomplice witnesses fall into two categories: those who testified about events in connection with Perez's murder and those who testified about events connected with Santiago's murder.[2]  We then address the testimony of the witnesses who were accomplices as a matter of law or fact.

### 1.    Non-Accomplice Testimony Concerning Jose Perez's Murder

A security guard who was working at Chilo's on May 20, 2006 heard shots fired in the parking lot.  From a window, the guard saw a slender young man who had not been in the restaurant that evening fire a gun at Perez, then run across the parking lot to a service station where a dark, older-model sedan was waiting with two people in the car's front seat.  The guard stated that the gunman jumped into the car through a back window, and the car was driven away.  The guard did not identify appellant, but to the contrary, testified that he had never seen appellant before.

Perez's wife said that she dated Santiago Salinas when she was a teenager and recognized him inside Chilo's while she was dining there with her family, but did not speak to him.  She testified that when her family left the restaurant and Perez opened the driver's-side door of their car, a man she had never seen before

---

[2] The testimony of two witnesses does not fall into either category.  One of these witnesses is a police officer who merely authenticated a recording of Chapa's out-of-court statement.  The remaining witness is an agent with the federal Bureau of Alcohol, Tobacco and Firearms.  He testified that in reviewing documentation of firearm purchases, he discovered that in July 2008—more than two years after Perez's murder—a certain individual legally purchased a large number of firearms.  Neither the guns nor that individual are alleged to have played any role in the killings.  The agent testified that this individual agreed to speak to Pedro Quintanilla while wearing a listening device, but he did not identify the reason the individual agreed to do so or present any evidence about what was said.  Neither the individual who wore the listening device nor Quintanilla testified, and the tape was not in evidence.

11

approached and began shooting at Perez. She did not describe the man at trial.

A crime-scene investigator testified that the casings from five .45-caliber hollow-point bullets were recovered from the scene. The same witness authenticated the physical evidence and photographs and described his creation of a diagram depicting the flight path of the bullets. He concluded that the person who fired the gun was moving. A forensic pathologist testified that Perez died from gunshot wounds.

A Houston homicide detective testified that the restaurant's security video of the shooting was not of high quality, but that the gunman appeared to be a Hispanic male in his thirties, approximately 5'8" tall, and weighing 140 to 160 pounds. It is undisputed that appellant is not the person shown on the videotape. The detective stated that Perez had no criminal background and no enemies, and that the gunman did not speak or take any property. He further stated that he could find no motive for the unprovoked killing, and although he followed every lead, no identifications were made.

A Pasadena police detective testified that he first heard about the Perez murder from Rosales, who called him within a few days after the shooting and said that the person who was killed was not the intended victim. The detective said that he told Rosales that he should call the Houston Police Department or Crime Stoppers. Rosales did not identify the intended victim or anyone involved.

Although the jury was free to consider the testimony from each of these witnesses without regard to whether it was corroborated, none of this evidence, individually or cumulatively, tends to connect appellant to Perez's murder.

### 2. *Non-Accomplice Testimony Concerning Santiago Salinas's Murder*

An employee of the Baymont Inn near Hobby Airport in Houston testified

that he was in charge of the hotel's front desk at around 2:00 a.m. on November 21, 2006 when a Hispanic male checked in. The witness stated that he later heard gunshots, and when he walked in the direction of the sounds, he saw a man lying in a puddle of blood across a hotel-room doorway. The witness called 911. A crime-scene investigator for the Houston Police Department testified that the body of the man discovered at the Baymont Inn appeared to have been moved. He further stated that the victim's wounds were consistent with the findings one would expect if at least one shot was fired as the victim lay on the ground. Stippling on the victim's ear showed that a wound to the back of the victim's head was the result of a gun being fired at very close range or even touching the skin. No casings were recovered from the scene.

Santiago's brother Saul identified Santiago as the person depicted in photographs of victim of the shooting at the Baymont Inn. Saul testified that he and Santiago used to "hang out" with appellant's two brothers, Danny and Robert, but that they also knew appellant. He further stated that during two months in 2005, he picked up drugs from appellant's house, and that Danny sent appellant the drugs from Monterrey. The witness stated both that appellant stopped selling drugs to him about two or three weeks after some cocaine was stolen from Rogelio Gonzalez's house during a home invasion and that appellant stopped doing business with him after the attempt on Santiago's life.

Santiago's mother testified that Santiago and appellant had known each other since they were children. She stated that Santiago also knew appellant's brother Danny, and that Santiago's wife was from Monterrey. The witness testified that on September 30, 2005, Santiago was shot in the leg and the side of his head in Monterrey, and that he was hospitalized in a coma. She further testified that while she was visiting her son at the hospital, Danny Zamora and Robert Vaca

came to visit him, and she told Danny to leave. Finally, she stated that Santiago was hospitalized in Monterrey for about ten days, then flew back to Houston. There is no evidence that appellant was in Monterrey when Santiago was shot.

Once again, none of this testimony tends to connect appellant to the charged offense.

### 3. *Accomplice Testimony*

We now consider the testimony of the accomplices as a matter of law or as a matter of fact. Because the trial court instructed the jury that Michael Belmarez is an accomplice as a matter of law, his testimony could not be considered as evidence of appellant's guilt unless it was corroborated by other evidence. The remaining witnesses were accomplices-in-fact, and thus, the corroboration requirement did not apply to any of those witnesses unless the jury first would have determined that the witness truly was an accomplice.

#### a. Michael Belmarez

Belmarez admitted he was the driver of the car in which the person who shot Jose Perez fled the scene, and he identified Pedro Quintanilla as the gunman. Belmarez described the following chain of events:

According to Belmarez, Steven Torres told him that he had a kidnapping job for him. Torres gave guns to Belmarez and Quintanilla and showed Belmarez a photograph of a person he identified as "Chago." On two occasions, Torres called and said that Chago's truck was sighted at a hotel called the Mustang Inn, and Belmarez and Quintanilla went there, but did not find Chago. At a later time, Quintanilla called Belmarez and said that Torres had called to report that Chago was at Chilo's. Belmarez picked up Quintanilla and they went to the restaurant. They drove around the restaurant and reported to Torres that they did not see Chago's truck. Torres told Quintanilla that Chago was sitting by the window and

14

wearing an old-style Astros jersey. Belmarez parked the car at an adjacent gas station and went into the restaurant, where he saw the man that Torres described. He went back to the car, and when Torres called Quintanilla again, Torres told Quintanilla to kill Chago. When Quintanilla saw the man in the jersey exit the restaurant, he pursued and shot him, then ran back to the car. Belmarez and Quintanilla left, and Quintanilla called Torres and told him that the job was done.

In a news broadcast, someone attempted to describe the car in which the gunman had left the scene, but the year and make of the car did not match the vehicle that Belmarez had been driving. Torres nevertheless caused Belmarez's vehicle to be repainted. Torres paid Belmarez $1500 the day after the shooting, and although he later said that the wrong person had been killed, Torres did not ask Belmarez to return the money.

Belmarez testified that he did not know appellant, appellant's brother Danny, or Santiago Salinas; he did not even know Ben Rosales. He did not have a clear idea of the intended victim's appearance because he was only shown the man's photograph. He did not even know the intended victim's real name. There is no evidence that Belmarez knew how the intended victim was chosen, why, or by whom.

None of the non-accomplice-witness testimony summarized thus far tends to connect appellant to the charged offense; thus, jurors could use Belmarez's testimony as evidence of appellant's guilt only if jurors (i) failed to find that Rosales, Gonzalez, or Chapa was an accomplice; and (ii) the non-accomplice's testimony tends to connect appellant to Perez's murder. We conclude, however, that is highly improbable that jurors would have failed to find that any of the three were not accomplices.

15

### b. Ben "B52" Rosales

We already have summarized Rosales's testimony and explained why it created a question of fact as to whether Rosales was an accomplice in Perez's murder. For several reasons, we are convinced that the jury would have resolved that question of fact by concluding that Rosales was an accomplice in the charged offense.

First, Rosales testified that appellant decided to have Santiago killed after Santiago returned from Monterrey and boasted that "[t]hey couldn't kill him." That first attempt to kill Santiago occurred eight months before Perez's murder. It is undisputed that all of Rosales's attempts to find Santiago occurred after Santiago returned from Monterrey after having already survived one murder attempt.

Second, throughout the time that Rosales tried to find Santiago for appellant, he knew that appellant "had some people already ready to go and get him." Moreover, he knew that the Zamora family already had caused Santiago to be shot even though Santiago had repaid some of the money that the Zamoras believed they were owed.

Third, Rosales admitted that in the months before Perez's death, Rosales called appellant on two occasions to report that he had seen Santiago, but Santiago was not apprehended. Belmarez testified that before Perez's death, he and Quintanilla twice were called to respond to sightings of Santiago, but did not find him.

Fourth, although Rosales later testified that appellant decided to have Santiago killed after Danny was killed, the shooting at Chilo's occurred six months before Danny's death. Rosales knew that Santiago was the intended target of the shooting at Chilo's.

It is possible that someone else was looking for Santiago, although Rosales was the only one identified. It also is possible that if others were looking for Santiago, then it was the unidentified searchers who twice reported seeing Santiago, and that Belmarez was called to respond to those sightings, but was not called to respond to Rosales's sightings. In theory, it is possible that even though appellant had told both Rosales and Gonzalez before the shooting at Chilo's that he had contracted for someone to kill Santiago, his reference to "people already ready to go and get him" meant a different group of people who had no such intent or who had been offered no remuneration. The probability, however, is vanishingly remote, and the jury almost certainly would have recognized that.

We conclude that if the jury had been properly instructed, it would have found Rosales to be an accomplice in the charged offense.

### c.  Rogelio "Roy" Gonzalez

Rogelio "Roy" Gonzalez testified that he is appellant's brother-in-law and began working for the Zamora family's drug business in December 2004. Gonzalez kept the records, transported money and drugs, and stored drugs at his home. Gonzalez explained that the Zamoras used three vehicles with hidden compartments to transport drugs into the United States. The driver would telephone appellant to tell him the vehicle's location, then appellant and Gonzalez would retrieve the vehicle and unload the drugs. The payment for the drugs was put into the compartments and the driver returned the vehicle to Mexico. Santiago and Saul Salinas were among appellant's drug customers.

According to Gonzalez, the relationship between appellant and Santiago first began to sour when Gonzalez and appellant saw one of the drug-transport vehicles parked near a vehicle owned by Santiago's brother Saul. Appellant and Gonzalez followed the drug-transport vehicle to Slick Willie's, and saw Saul drive to the

17

same place. Appellant concluded that Santiago was trying to cut him out of the drug deal. Gonzalez testified that Danny handled the problem with the driver, and that appellant decided not to do anything about Saul.

In an apparently unrelated incident sometime between May and July of 2005, four men broke into Gonzalez's home while he was home with his wife and children. They tied Gonzalez's hands and feet and pistol-whipped him, demanding to know where the drugs were hidden. Although Gonzalez did not tell them, the men discovered seventeen kilos of cocaine in his house and stole the drugs. According to Gonzalez, appellant's participation in trying to kill Santiago began in 2005, when it was discovered that Santiago had been behind the home invasion. Appellant, Danny, and Gonzalez discussed Santiago's involvement in the cocaine theft, and when Santiago was in Monterrey, Danny told Gonzalez that they were going to kill Santiago that night. Santiago survived that attempt.

Gonzalez then described the second murder attempt. He said that appellant contracted with "Mando" Chapa to kill Santiago, but never tried to get Gonzalez to assist. On the afternoon of the day that Perez was shot, appellant told Gonzalez there was going to be another attempt to kill Santiago that night. Appellant told Gonzalez to pick up appellant's parents and take them to Gonzalez's house and turn off the phones. The next day, Gonzalez saw Santiago at a traffic light. Gonzalez called Danny and told him about it because Gonzalez knew that Danny also was involved in the plans to have Santiago killed. Danny said he would check it out. Appellant called Gonzalez back and said that "they messed it up" at Chilo's the night before. Appellant nevertheless paid Chapa $14,000 for the killing, and Gonzalez recorded it in the books as "Chago's job."

Gonzalez said that on November 2, 2006, Danny Zamora was shot in the head fourteen times. Gonzalez and appellant blamed Santiago for Danny's death,

18

and appellant contracted with Rosales for Santiago's murder.  Because the price of cocaine had risen, the contract was for between $17,000 and $18,000.  Unlike the day on which Perez was killed, appellant did not give Gonzalez advance notice of the next attempt on Santiago's life.  The day after Santiago was killed, appellant told Gonzalez that the job was done and that he needed to bring $9,000 to Rosales's shop.  Gonzalez brought the money and when he arrived, appellant and Rosales were the only people there.  They said that when Santiago was dying, but still moving, the person who shot him was laughing.  Gonzalez gave the money to appellant, who handed it to Rosales.

In determining whether Gonzalez was an accomplice, jurors also could rely on the following testimony:

> Q:    And according to your testimony, you were there, participated in and surrounded all of the planning leading up to [the murder at Chilo's].
>
> A:    I was there? I participated in what?
>
> Q:    You were among -- by your testimony – I'm just going by your testimony.  You were among all of the different people that talked about the possibility of killing Mr. Salinas before the incident at Chilo's, right?
>
> A:    Yeah.

Gonzalez further stated that under his agreement with the prosecutor, he had been given immunity from prosecution for capital murder.

The surest indicator that the jury would have considered Gonzalez to be an accomplice, however, is the jury's written request for a read-back of testimony "corroborating" Gonzalez's testimony.  *See Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008) (considering the jury's request for a read-back of testimony as part of the court's evaluation of whether charge error caused egregious harm); *Druery*, 225 S.W.3d at 498 (stating that the benefit of an

19

accomplice-witness instruction is that it "requir[es] additional corroborating evidence that would otherwise not be required").

We review the record for actual and not just theoretical harm, and because the requirement for evidence "corroborating" Gonzalez's testimony applied only if the jury concluded that Gonzalez was an accomplice in the charged offense, we conclude that the jury actually determined that Gonzalez was an accomplice.

### d.    Jose Armando "Mando" Chapa

Chapa testified that he's known appellant since childhood, but was closer to appellant's brother Danny. He admitted knowing Torres and Santiago, but denied knowing Belmarez, Quintanilla, and Rosales. He admitted telling police that he met Torres at the end of 2005, and that he testified in a previous trial that he introduced Torres and appellant to each other at a barbeque at his house in January or February of 2006. He also told the police about a phone call from appellant. According to Chapa, appellant said that he, appellant, was trying to get in touch with Torres about a person at Chilo's wearing a jersey. Chapa admittedly told police that after this conversation with appellant, Chapa called Torres and told Torres that appellant wanted to talk to him.[3] He denied giving Torres money.

Although closing argument is not evidence, the State's closing argument included an additional reason for the jury to conclude that Chapa was an accomplice. The State asserted that Chapa was present at Chilo's and was the person who actually misidentified Perez as Santiago, and the trial court overruled

---

[3] Nearly all of these admissions were made after portions of Chapa's tape-recorded statement were played to him in court. Although we are unable to determine what specific parts of the tape were played, we do know that the jury was not permitted to consider that evidence as corroboration of accomplice testimony. The charge informed jurors of the corroboration requirement, and further instructed them that "certain audio recordings were admitted in evidence in this case. Such items were admitted only for the purpose of impeaching the testimony of Jose Armando Chapa, if they do."

defense counsel's objection that there was no such evidence.

Chapa did not admit that anyone involved in Perez's murder acted under his direction, but, given the record evidence, we are confident that jurors would have determined that Chapa was appellant's accomplice in the charged offense. This is so because, under the charge as given, reasonable jurors could have convicted appellant only under the theory that appellant's offer to pay someone to shoot Santiago caused Perez to be murdered when he was mistaken for Santiago. Gonzalez testified that appellant not only contracted with Chapa to kill Santiago, but that appellant paid Chapa for the murder even though Perez was mistakenly killed in Santiago's place. There is no controverting evidence that, before Perez's death, appellant promised to pay anyone other than Chapa for Santiago's murder, nor is there any evidence that appellant himself paid anyone other than Chapa for the shooting at Chilo's.

Because the jury almost certainly determined that both Gonzalez and Chapa were accomplices in the charged offense and would have made the same determination about Rosales if properly instructed, we conclude that if the jury had been properly instructed, it would have found no non-accomplice evidence tending to connect appellant to the charged offense.

## C. Counsels' Arguments

In determining the extent of harm from the charge error, we also must consider the arguments of counsel. We already have mentioned the State's argument that Chapa was the person who misidentified Perez, but additional statements from both counsel add further support to our conclusion that the charge error caused egregious harm. Specifically, appellant's theory of the case was that the only evidence tending to connect him to Perez's murder was the testimony of accomplice witnesses, and the State emphasized that there was no accomplice-

witness instruction concerning Rosales.

Appellant's theory of the case was succinctly articulated by his counsel in closing argument: "[T]he State is attempting to secure a conviction based on no physical evidence of any kind to substantiate [appellant's] involvement[,] based on *nothing to corroborate the testimony of three people*." (emphasis added). He then discussed the testimony of Rosales, Gonzales, and Chapa:

> Each and every one of them came to you and confessed to capital murder and said, But I know I'm not going to be charged. What would you say to keep from being charged with capital murder? I know what those guys would say. Anything they needed to say.
>
> . . . .
>
> It's just not okay to let *the testimony of these three people be the only thing that connects a human being to a capital murder charge*. It's just not okay. *It is so suspect that two of the three you got a specific instruction that says wait a minute, not unless something else connects them.*
>
> *One of them you don't have a specific instruction* but you saw this guy Rosales. You saw him. You heard him. If he lies to you one time, two times or five times, you know he will lie about whatever he needs to lie about. Because the one thing he absolutely said with conviction, he didn't want to be charged with capital murder. *And he agreed that the only thing keeping him from being charged with capital murder was cooperating against Jaime Zamora.*
>
> . . . .
>
> [I]f [the State doesn't] bring something to corroborate people who have lied to you, it's wrong for you to convict.
>
> . . . .
>
> I mean, they didn't bring in any evidence whatsoever to connect any of those three to the truth. And just because all of them connect each other to the same story, sort of, they don't even agree on the details. But just because they're all connected to the same story doesn't connect them to the truth.

(emphasis added).

The State argued as follows:

> But you have another instruction.  And the instruction is . . . whether or not you need corroborating evidence.
>
> Now, the Judge has told you in your charge that Michael Belmarez is an accomplice as a matter of law. . . .  In the charge there's a question for Rogelio and for Chapa as to whether or not you believe they are accomplices in the commission of the Chilo's capital murder.
>
> . . . .
>
> *[T]here's not that same charge given to you for Ben Rosales*.
>
> Now, Ben Rosales was way all up in Baymont.  Totally up on Baymont.  He's the one -- he was there, first of all, with the defendant. He's the one that got the contract for it.  But we aren't trying Baymont.  We're trying Chilo's.  And at the time of the Chilo's, Ben Rosales, at that point, was not involved in the commission of the capital murder.

(emphasis added).

At this point, defense counsel objected to the mischaracterization of testimony, and the trial court overruled the objection.  The State then continued as follows:

> That Ben Rosales was not -- *you don't have a charge on this.  You can consider the evidence of Ben Rosales* through all the testimony and in looking at the chart, State's 106, about who knew what where.

State's Exhibit 106 was a demonstrative aid that is not in the record, but which included information drawn from the testimony of the accomplice witnesses.

As the closing arguments illustrate, the pivotal issue in this case was the determination of who was and who was not an accomplice, and the State relied on Rosales's testimony to provide the corroboration for the other accomplices.  For this reason, as well as for the reasons previously discussed, we conclude that appellant was egregiously harmed by the charge error.

23

**D.    Other Relevant Information Revealed by the Record**

We previously have discussed the jury's request to have the court reporter read testimony "corroborating" Gonzalez's testimony, and the record reveals no other information that is relevant to our harm analysis and that we have not addressed.

## IV. CONCLUSION

We conclude that the trial court's failure to instruct the jury that there was a question of fact about Rosales's status as an accomplice under a co-conspirator theory of liability egregiously harmed appellant in that it made the case clearly and significantly more persuasive and deprived him of the statutory right not to be convicted of an offense based on the uncorroborated testimony of accomplice witnesses.  We accordingly reverse the judgment of conviction and remand the case for retrial.


/s/    Tracy Christopher
Justice

Panel consists of Chief Justice Frost and Justices Christopher and McCally.
Publish — TEX. R. APP. P. 47.2(b).

24